Our final case for oral argument this morning is case number 24-2947, Judith Govatos and Dr. Paul Breiman v. Phil Murphy, et al. Mr., did you pronounce it the French way, Chabot, or Chabot? Not the French way, Your Honor, Chabot. Chabot, okay. Thank you, Chabot. And good afternoon, Your Honors, and may it please the Court. Ryan Chabot for plaintiff, appellants Dr. Paul Breiman and Judy Govatos. With the Court's permission, I'd like to reserve three minutes for rebuttal.  Counsel, can I ask you to start with something that you didn't brief, and I apologize for that. Governor Myers, as you probably know, recently signed a bill in Delaware that adopts virtually the identical law in Delaware. I want you to think with me and discuss with me whether or not, how that affects Ms. Govatos' standing, if at all. So, I don't think it affects her at all right now, and I actually don't think that it would affect her at all even when that statute becomes effective. So, my understanding of that statute is that the soonest it could become effective would be January of 2026. That's the first time. It would either be soonest it becomes effective is either when the regs are in place by the AG's office or January 1. Right, Your Honor. So, the latest is January 1? The latest is January 1, but my understanding of where the regulatory process is is that that's not, it wouldn't be in effect any sooner than that, given where the regulatory process is. Even if it is in effect, so, I think at absolute riskiest, her claim could become moot when she has the option of medically even dying in Delaware. I don't think it has any effect on her case today, and whether this court has jurisdiction today. But in order to apply under either statute, doesn't she have to be certified to be within six months of death? So, she has to, in order to get the prescription for medical aid in dying under either statute, she has to be certified by an attending and a consulting physician that her prognosis is less than six months to live. But she's prevented today from initiating the process of finding a physician to care for her and finding a physician to meet these. Right, but there's a ripeness question, and ordinarily you think stage four cancer are pretty serious, but she's had stage four cancer for well over a decade as I understand it, right? Fourteen years, something like that. So, how do we know it's ripe and she's not just going to die with the disease rather than of it? So, it's a possibility, Your Honor, but the ripeness question today is whether or not there are any additional facts that would change whether there's an actual dispute between her and the state. I mean, I think this court's decision in step saver sets out what are the relevant considerations for ripeness. And first, it's whether there's adversity between the parties. There's certainly adversity here because the state says, the second two factors are whether or not a judgment would be effective and conclusive. A judgment that she got today that said that medical aid in dying could not be restricted to New Jersey residents would allow her to find a physician in New Jersey today and make the first request for medical aid in dying. Just a practical question, but let's say she really likes the doctor that she consulted with in Jersey, and I assume, by the way, it's not Dr. Bryman, is that correct? That's correct. But she really likes the doctor that she consulted with. Wouldn't it be very easy for her to take a very quick trip from Wilmington, 10 minutes away across the river, and become a resident of New Jersey for that purpose? She would have to establish residency by having a property here. And I think to fulfill any of the three requirements... Law doesn't say anything about having property. You can have a voter's registration, or a driver's license registration, or a utility or something else. Like, she could get an Airbnb for a few weeks. Your Honor, I don't think that having an Airbnb for a few weeks would qualify her for any of the requirements for New Jersey residency, to establish residency here. I think for each of those three possibilities, voting registration, a driver's license, or any other government-recorded residency, like a utility bill, she would have to establish... She can have a cell phone that gets billed to an Airbnb for a few weeks. The law, nothing on its face says she has to have a property here. Your Honor, I think that would be an attempt to sort of circumvent the residency requirement of the law. Okay, well I'll ask your friends on the other side whether there's anything in the law that prevents that from qualifying for residency. I think even if that were an acceptable way to prove residency under the statute, it doesn't change any of the facts of whether or not New Jersey can constitutionally restrict this medical service to its residents, or people willing to take these steps to become residents. It sort of highlights the privileges and immunities. You want the merits answered. The question is, is this the right person? Ms. Seeley is now deceased, so we're left with Ms. Gavados, who hasn't been yet certified to be within six months of death, and thank goodness that's the case. But, is she the proper, is this right in Judge Bevis' question to you? Yes, Your Honor. It is absolutely right, despite the fact that she hasn't received a prognosis of six months from an attending and consulting physician today, because that's part of the statutory scheme that she's precluded from participating in, because she's a non-resident. The statute says that if she wants to avail herself of medical aid and dying prescription, she has to go find an attending physician, and the attending physician is required to take certain steps to confirm things. One of it is her residency, and she's precluded from that first step. The next, one of the other steps, is whether or not she has a six-month prognosis. And that's in the, is that in the first visit, that first step? So, Your Honor, the statute, I think, is a little bit ambiguous about this. You have to make three requests, an oral request, a written request, and a second oral request. The written request can be made any time at or after you make the first oral request. It's the written request that the person has to say, I'm a New Jersey resident. And at that stage, the physician has to determine that they are a New Jersey resident. Ms. Gavatos, the door is closed to her of this medication today. But let me ask you, we're asking about the diagnosis, though, and needing six months. Is that triggered for the first request, the oral request? Do you have to have a six-month diagnosis in order to meet with doctors and interview doctors that you might want to use? So, the statute only talks about the six-month diagnosis being part of what you need to confirm when you receive the written request. But it's the attending and the consulting physician who have to make that diagnosis. So, it's a practical matter. These are two, I think, two important practical points. I want to ask you some questions about Dr. Breiman. Now, in discussing the state's interest, New Jersey's justification is, well, we want to prevent friction from other states for stuff that happens out of state. And you responded very vehemently, there's no allegation here that any physician is doing anything out of state. So, Mr. Breiman, there's no allegation that he is going to another state to provide these drugs or providing these drugs for anyone to take to another state. I see you nodding in response. Is that a yes to both of those questions? Yes, Your Honor. Okay. Does Mr. Breiman have any plans to go to another state to provide drugs or send drugs into another state? No, Your Honor. Mr. Breiman is only prescribing medical aid and dying treatment to residents because if he didn't, he did anything else. He would be subject to criminal and professional assault. And Ms. Gavatos is not a patient of Dr. Breiman's? Correct. And Ms. Seeley wasn't a patient of Dr. Breiman's? Correct. Does he have any non-New Jersey patients who are potentially eligible for aid in dying? Your Honor, so he would have non-New Jersey resident patients if he was eligible to give those care to them. Okay. Is there any allegation about specific people? Is there a current one? A current one or one who approached him who was being stopped solely by the law? I did not see it in the complaint. In paragraph 41 is where we lay out what Dr. Breiman's allegations are about his desire to, he would prescribe to non-resident patients if there were non-resident patients. I saw that, but it was in very general terms. It wasn't about a specific patient that approached him or he had conversations. It was like the loss of a particular patient pool or something like that. You're right, Your Honor. I agree that we didn't allege a loss of a particular patient for Dr. Breiman or something along those lines. I think that if there had been a 12B1 motion here that was challenged on a factual basis to say, hey, Dr. Breiman doesn't actually have any patients that qualify here, then we could have put in the evidence that he has actually lost business. People have reached out to him. I mean, he's a well-known practitioner. Are you aware of a conversation with your clients that he said he had particular people he's lost business with? No, Your Honor, because it didn't come up with the district court. It hasn't come up before. You have no basis for anything on that. Let's talk about this statute. This statute is designed for patients, right? It's designed to give patients additional options, correct? Yes. Your client is not, Dr. Breiman is not within the zone of interest protected by the statute. It's Ms. Gavatos who is, correct? Yes. So I agree with that. However, Dr. Breiman is the regulated party here. And I think the third-party standing analysis as to him is, has he suffered an injury of his own that gets him in the courthouse door, which he has because he's... All right, but the only allegation is this paragraph 41. He has not been threatened by Governor Murphy or the Attorney General anywhere else that we are going to prosecute you or we would prosecute you if you took this step. You've not gotten any communications, anything like that. So in fact, Your Honor, that, again, not in the record because this wasn't litigated below, but this has happened to Dr. Breiman. So Dr. Breiman had an instance where he treated a patient who received and took the medical aid in dying medication, and he submitted the report filed by the statute. And because of an error on the death certificate, it was indicated that the patient was not a resident of New Jersey. And he was subject to a Medical Board of Examiners examination and investigation, an in-person interview about what happened there and whether or not he had violated the statute. But none of the defendants did anything to your client? Your Honor, the Medical Board of Examiners is the first step, the first line of the state's enforcement of the residency requirement here. So I wouldn't agree that the New Jersey Medical Board of Examiners investigating this is not the defendants sort of acting, at least in the front line. And all that we need to show for standing for either of these folks for declaratory and injunctive relief is that they are sufficiently, reasonably likely to suffer from an injury in the future, not that they have suffered one in the past. And I think I heard you say your position is that he is not, you're not relying on third-party standing. So, for Dr. Breiman, he has third-party standing to bring the claims under the Privileges and Immunities Clause and the Equal Protection Clause. He has first-party standing to bring his Dormant Commerce Clause. In terms of Dormant Commerce, but in terms of the third-party standing here, what is the obstacle? I mean, I think in the pregnancy or abortion cases, you know, it's very quick, it can be very difficult for a woman to litigate this thing through in nine months. But as Govatos' situation suggests, you know, aid in dying can be foreseen for much longer. So, is there really the same obstacle to first-party standing litigation of those claims? So, Your Honor, I will give you a legal answer to that question and a factual answer to that question. The legal answer is, as this Court said in its psychiatric, Pennsylvania Psychiatric Association decision, which is sort of the governing third-party standing decision here, a criterion doesn't have to be an absolute bar from suit. Some hindrance to a third-party's ability is enough. And in that case, the mere stigma associated with mental illness was deemed by this Court to be enough to reach the impediment on the first party. My factual answer is, we had two plaintiffs at the start of this case, and one of them died. And Ms. Govatos is an 81-year-old woman with incurable cancer. At some point in this litigation, if we get what we want and we go back for fact discovery, she will pass away and we will be left with nothing. To both standing questions, it can't be the case that the only period of time when this law could be challenged, the Constitution could be challenged, is in the narrow six-month window between when somebody is at death's door. And that's the only window between brightness and mootness in this case. Today, Ms. Govatos is unable to take the first level steps. She can't open the door to this care and take the first steps to start arranging her end-of-life care. She wants to plan today. I think this Court's rightness decisions, like Mazzo, about planning for future elections, show that the desire to plan for something today is at the core of why you get a declaratory and injunctive relief. And that is more than sufficient to establish standing for both of the plaintiffs today. Your primary argument on the merits is that, obviously, privileges and immunities offered to New Jersey residents under the Constitution need to be offered to residents elsewhere for the same services. And also, the Adornment Commerce Clause. Obviously, you have to rely on a few sentences in Bolton. Is Bolton still good law today? Yes. If indeed, that first question, I guess, are those statements a holding in Bolton? Yes. The statement in Bolton is a holding as to the privileges and immunities clause claim. Now, there's other claims presented in that case, and to the extent that they are 14th Amendment fundamental due process holdings, then Bolton is no longer good law after DoS. There's two questions about that. First of all, aren't all the later parts of Bolton piggybacked on the beginning, the central part of Bolton, which is, hey, there's a fundamental right to have an abortion here? No, Your Honor. So, fundamental privileges is how the Supreme Court has described it in McBurney and other cases. Fundamental privileges under the Article 14 Privileges and Immunities Clause are not co-extensive. They're not co-extensive, but you seem to be a-for-sure. If it's a fundamental right, then it must also be a fundamental privilege. Maybe fundamental privilege is a broader category than fundamental right. I think that's probably right, Your Honor. A fundamental right under the Substantive Due Process Clause, no state could prohibit. Every state would require medical aid in dying. We know that's not the case in Bolton. Right, but that does suggest, then, that once you've established a fundamental right, then we don't need any further discussion to show that it's certainly a fundamental privilege. Your Honor, I don't think that-so, Bolton's analysis is short. I think it's because it's an easy question. It's short because it seems so easy, because it seemed like it had been established. But let's go on. There was no out-of-state plaintiff in Doe versus Bolton. So, it's not clear to me that the right to travel was dispositive there. Your Honor, I don't think-I agree with what you're saying, and it's true that Ms. Doe there, Mary Doe, is not an out-of-state plaintiff. I mean, the Supreme Court's holding there, I think, is still sufficiently clear to say that it's binding on this Court and future courts. The Supreme Court itself has characterized Bolton a couple times as not involving fundamental rights, and is establishing as a matter of the Article IV, Privileges and Immunities Clause, that procuring medical services is a privilege protected by the- All right, I've looked at the citations. This case has not been cited a lot. This holding, I can't find-there's like one district court following it, and it's older. So, there's not a lot. But let's grant you that it was a holding, and let's grant that, you know, all of that. Why don't we view Glucksburg as changing all of this? Whether abortion was or is a fundamental right or fundamental privilege, right? Which you-we're talking about aid in dying here. And Washington v. Glucksburg seems to make clear, like, no fundamental right. I think you read it as no fundamental privilege. Different states are going to do different things about this, and that's just fine. It is just fine, Your Honor, and I think that's exactly right. But once the state decides to make this medical service available in its state, it can't under a separate provision of the Constitution about who it's available to. And so, that's really the difference, I think, why Glucksburg is not dispositive here. I agree that Bolton is not a heavily reliable case. I guess the two places I would point you to are in Siennes. The court characterizes Bolton as establishing that procuring medical services writ large is a fundamental right under the Articles of Privileges and Immunities. General medical care, as I understand it. No, Your Honor, not in Siennes. So, Bolton has two sentences that are relevant here. The first one says that accessing medical services is a fundamental privilege protected by the right. I thought Bolton said that general medical care is a fundamental right for purposes of the 14th Amendment. No, I'm sorry, Your Honor. So, Bolton establishes that accessing medical services is a privilege protected by the Privileges and Immunities Clause. Its second sentence refers to it as general medical care. In later cases, particularly Siennes, the Supreme Court has characterized Bolton's holding as, quote, procuring medical services is the privilege protected by the Privileges and Immunities Clause claim. One other place I would point you to, Your Honors, is in just a few years after Bolton, the dissenters from Baldwin have a footnote that says, in Bolton, we established that medical services is within the panoply of privileges protected by the court. And it expressly says that did not turn on the fundamental nature of the right to an abortion at the time. It's a dissent, but it is three members of the Supreme Court saying that that's not how we interpret Bolton. Siennes, just to digress for a second, and it kind of relates back to an earlier question I asked, could she reside in New Jersey? Siennes said for purposes of getting AFDC benefits, you have to be treated equally in your new state of residence without the durational residency requirements necessarily. So how is Siennes on point in helping you other than a, in effect, dictum that relates to medical care if it's a fundamental right or not? So Siennes is not the key case here, Your Honor. It sort of establishes that there's these three different parts of the right to travel. Siennes is a Part 3 case. Ours is a Part 2 case, which is the right to travel as a... There's a number of cases on, you can't have durational requirements. But as you admit, this is a separate component, which is just establishing residency at all. I don't see how your argument wouldn't mean, I mean, can New Jersey say we're going to charge a lower tuition for Rutgers in state than for people who are out of state? Doesn't your argument threaten that? No. Why not? So the Supreme Court has answered that question and said that that's permissible. Two points. One, there are cases that establish Bolton as one of them. Another is Hicklin versus Orbeck, which is the Alaska employment case. Those are cases that find there's a violation of the Privileges and Immunities Clause without a durational requirement, just discrimination between residents and non-residents. The difference between when a state can and cannot discriminate against residents and non-residents, first of all, the clause is implicated, right? That's step one. And the district court, erroneously in our view, rejected our claim at step one. But if you have a sort of categorical difference between the three that have come up to the Supreme Court are voting and serving in office and in-state tuition. In each of those cases, the court said, yes, I mean, it implicates the Privileges and Immunities Clause. These are fundamental privileges. They're protected. But then you do the balancing. It's a balancing test after that. And I think the line that gets drawn in cases like Baldwin is when the state itself is providing a service or its taxpayers are contributing funds to something, then you have a much more, you have a much greater leeway under the Privileges and Immunities Clause claim to provide services for your residents. I mean, that's why states exist. But New Jersey is not providing medical aid and dying to its residents. You know, one of the concurring opinions in Baldwin says this specifically. This case would come out differently if Montana was barring private parties from hosting elk hunting to non-residents and charging them more. It matters here because it is the people of Montana who are fronting the bill for the very expensive and intricate management of the elk community. That's not the case, because New Jersey is just saying, we're allowing private parties to provide this medical service here, but we are categorically excluding non-residents. And that they cannot do under the Privileges and Immunities Clause. Can we assess New Jersey's justifications now for what it requires, or do we need to develop the factual record more? I think the record needs to be developed more. I mean, I think this Court shouldn't reach the reasons for two reasons. One, because the District Court didn't do that sort of balancing for either the Privileges and Immunities Clause claim or the Dormant Commerce Clause. So this Court shouldn't do it in the first instance. And two, I think it requires a factual development. And this is kind of the heart of what we think the District Court, in a very comprehensive decision, aired. She reached her decision on the Privileges and Immunities Clause claim by saying what is and is not general medical care. I disagree that matters, and that's the governing legal principle. But if it is, we should have gotten to put on evidence about what that is. Same for the market that was at issue for a Dormant Commerce Clause. Again, we think that a facial discrimination against non-residents is enough to trigger the clause. But if it's not, we should have gotten to put on evidence about what the market is. So, say this case continues. New Jersey produces evidence that the legislature really did act to protect patients from coercion and physicians from out-of-state criminal liability. And say this statute also shows that the statute is at least a decent fit. Not a perfect fit, but a good one. Doesn't your Privileges and Immunities Claim then fail? No, Your Honor. I mean, I think it depends on how the court balanced those things. I mean, it's always the case that there's some justification offered, usually it's health and safety, for one of these measures. But the key Privileges and Immunities question is whether or not there's a reason to discriminate people besides just the fact that they're non-residents. And I think we would get a chance to put on evidence that there's not a close connection between these things. Because friends on the other side offer the, you know, hey, 39 states still make this a crime. We're trying to avoid friction with other states. Why shouldn't we defer to that? And what fact-finding do we need? I mean, it's indisputable that this is still a crime in most states. And New Jersey wants to avoid sticking its nose into other states' business. Isn't that the way laboratories of democracy are supposed to work, with them staying in their own lanes? Well, Your Honor, I mean, New Jersey is not allowing medical aid in dying in a different state. It's allowing it in this state, but to residents and non-residents alike. We would be able to put into the factual record whether or not that is actually a risk at all. Is there any friction? There's 11 states where it's permitted. Have they experienced any of this hypothetical friction that's being postulated? That's the kind of evidence that we would be able to put on in the record. And then there would be a relatively complicated balancing of an express and statutory facial discrimination against non-residents, against whatever evidence that the state was able to put on to balance. In any event, it's not something that I think could be informed by this Court on a 12v6 motion below. For the Dormant Commerce Clause, normally it's that there is some type of economic discrimination. We've been told by the Court that that's the core. Say New Jersey produces evidence that the legislature had no protectionist aims, but acted solely in the interest of doctors and patients. Where does your Dormant Commerce Clause claim sit then? So I think that would not be dispositive about our Dormant Commerce Clause claim, including as to what standard of review it gets. I think the threshold question about economic protectionism is not what is actually motivating the legislature, it's what's happening on the face of the statute. And this is why we think that this is a strict scrutiny Dormant Commerce Clause case, because it is on its face saying non-residents cannot come to New Jersey and engage in this transaction. If the Court disagreed with that, then I think it would go to the Pike balancing test and say we would need to show that there is a sufficient incidental effect on interstate commerce there. But I don't think that even if New Jersey put on testimony from legislatures or something, I don't think there's a legislative history supporting this, that that was the reason, the motivation for them. I don't think that would actually be determinative of the Dormant Commerce Clause. When you see the Dormant Commerce Clause, I'm trying to protect an economic industry in my state, so that out-of-staters won't be harming my folks. Does that really apply in this case of medical care that there's an attempt to help your folks only and harm or impair or impede others somewhat, at least? That's not what this case is about. So, Your Honor, the Supreme Court's Dormant Commerce Clause decisions are clear that affecting non-resident purchasers, like misquivatos, is a Dormant Commerce Clause claim. There are also cases that deal with the same circumstances where it is in-state economic actors who are being inhibited in their ability to provide their services to out-of-state actors. And I would point the Court to two cases, at least. One is the Camps Newfound versus Town of Harrison case, which is about Maine summer camps. Maine taxes two different summer camps differently if they cater to predominantly residents or non-residents. Obviously, they are Maine-operating businesses within Maine, but the Supreme Court says you can't tax them differently based on if most of their campers are from in-state or out-of-state. And then the other is the City of Philadelphia versus New Jersey case, where New Jersey passed a law saying you can't import waste from outside of New Jersey into our landfills. And states that sent their waste to New Jersey sued. Now, even though the economic actor being, quote-unquote, protected was the in-state actor, the Supreme Court said that that still violates the Dormant Commerce Clause. It's the same here for Dr. Breiman, who's a New Jersey economic actor whose ability to provide services to out-of-state actors is being inhibited. All right. Thank you, counsel. Thank you. May it please the Court. Stephen Ehrlich on behalf of Appellees. For two independent reasons, the Court should affirm the decision below. Can we start with standing? Yes. If we determine that the physician's third party is standing, the physician's third party says that they're proceeding, they have third party standing with respect to the privileges and immunities claim and with respect to the          with respect to the equal protection claim. Has that been forfeited by the state? I don't think so. And it goes to, I think third party standing generally is treated as prudential. I think our general view is this is not a third party standing issue, but an Article 3 issue for both the patient plaintiff and the doctor plaintiff. And I can take each in turn, but I'll start with the doctor. I think it goes to a lot of your questions, Judge Bevis, which is he has no allegations of a current or prospective        patient who are non-residents, who are qualified, and who are likely to make use of medical aid in dying. I think you see that in cases like Glucksburg had doctors in that scenario. And you don't have to go far down the line. I mean, prospective patients might do who want to take advantage and things like that. But we have none of those allegations here. Is he within the zone of interest protected by this statute? We don't view it as a zone of interest case because the enforcement would be against him. The criminal, you know,    they're not challenging the actual criminal statute that would be enforced against him, but the medical aid in dying statute applies an immunity. And the enforcement would be against him. So we don't really view it as a zone of interest. We more view it as due to the allegations in this case. It's speculative that he would be prescribing medical aid in dying to anybody in particular. And it's similar to the allegations that we have on the patient side as well. Ms. Gavatos, she has two problems     that I think independently but certainly together are the problem. One are the issues that Judge Ambrose and Judge Bevis pointed out, which is the six months to qualify. And so she's not qualified for six months. I think the district court recognized this as well. And the second is, and this is at JA-72 and various other places, she talks about how she wishes to have the option of doing it. And if she's in unbearable pain and she qualifies, like I said, she's not qualified       We don't know if or when she'll ever be in unbearable pain. So I think our position is certainly in some allegations could be made in some case for a patient plaintiff to have standing and for a doctor to have standing. But it's not this case. Isn't Breiman the tougher case? I mean, you didn't challenge his third-party standing in the district court, did you? I think we had some footnotes on standing and the district court ended up sort of addressing it anyway.  We haven't challenged it along, in part because of what I'm saying is we're generally okay with third-party standing in this context. I think Your Honor's focus letter made us look a little bit more closely at the allegations and realize that these particular allegations are not enough. I think a doctor could certainly have enough allegations to get there. The doctor who was previously in the case and has retired has a little bit more specificity. And so maybe something approaching or past that, like I said, a current patient or prospective patient who they've consulted, who's going to take advantage of these services, can probably do the job in terms of adequate pleading. But we just, we don't have that here. And so that's the reason why we didn't do it. I think to my friend on the other side's point about the narrow time frame of challenging this, we don't view it that way. There's obviously the mootness exception for capable repetition, but evading... Let's imagine we had a case of a patient who had a very aggressive form of bone cancer, three years to live. It's almost always excruciating pain at the end. Right? If we view this as a rightness issue, the person might not be there, but the train is barreling down the tracks and it's pretty certain. So that might be a different case. You're not disputing that that person might have a right claim and standing, even if the person is not yet at death's door. That's correct, yeah. And I don't think this court needs to draw a specific line and a specific amount of months. Three years seems a little bit long, but if it was three years and when the time comes I'm definitely going to do it, those two things paired together might get you there. Again, three years might be a little bit much. But you get the idea. You can take those allegations on their face. The problem here is the two-fold problem of the she just wants the option and she's not medically qualified. We don't know if and when she'll be medically qualified, to your point, Your Honor. There's no allegations about that. And she's been in the state for quite a while. So on these particular facts here we just don't think it gets there. And then on the, just to finish my thought on the capable of repetition, I think the way Glucksburg was brought was some terminal patients and some doctors. The patients ended up unfortunately passing away by the time we got to the Supreme Court. And the Supreme Court nonetheless decided the case on the doctors. And so you have the capable of repetition for the doctors. I don't think it would work for the patients because they're not capable of repetition for obvious reasons. But the doctors with proper allegations would have standing even if their patient died. They could probably overcome mootness. So I think that's how the scenario would play out. We're not saying there's a narrow six-month window and nothing else. And then on the merits,  unless you have more, I'm happy to talk, of course, about standing anymore. But I think we think this is a fairly easy case on all the claims, but especially on privileges and immunities where the discussion focused. And I'll take the points. I'll start with McBurney, which I think is the real case here. And in our view, it's very simple. McBurney lays out what the analysis you do for a fundamental privilege. You look at English common law. You look at 19th century American cases. Well, wait a minute. Let me ask you a question about that. So when you look at McBurney, McBurney basically says, we're going to look at this law. The plaintiffs have alleged that the law violates the Constitution in four ways. And in the first three ways, it does not do a historical analysis. It says, we've already said this is a fundamental privilege. This is why this thing doesn't affect that. It only does the fundamental privilege analysis on the very last argument because that has not been recognized as a fundamental privilege. So are you saying that even if the Supreme Court has recognized something as a fundamental privilege, if the Supreme Court itself didn't do that historical analysis, we as a court of appeals can go back and say, well, the Supreme Court said it was a fundamental privilege, but they didn't do the historical analysis. So let me engage in that. Well, I think yes and no. I think McBurney lays out the analysis that you need to do. If there was a squarely on-point holding, and I think Your Honor is referring to Bolton, which I'm happy to talk about, and I think it's distinguishable for all the reasons that Your Honors were discussing in the colloquy with my friend on the other side. But I think you're right that the fourth one is the one we're focusing on because here what's at issue is medical aid in dying. So you have Bolton, which has some fairly broad what I would say dicta because it's not essential to the holding of the case. As you pointed out, Judge Bevis, there wasn't an out-of-state plaintiff. Of course, the case was about abortion, which they had just recognized the same day was a constitutional right. But you also have multiple Supreme Court opinions saying certain things. You have them saying we don't read opinions like statutes and parse them that finely. We look at them in the circumstances they were decided. You have McBurney telling you what type of analysis you do for a fundamental privileges and immunities analysis. And you have the Supreme Court repeatedly telling us for 170 years going back to Connor that you frame the right narrowly on a case-by-case basis. And when you do that here, when you frame the right narrowly, you say we're looking at medical aid in dying. We look at McBurney. McBurney says to do a fundamental analysis in the things that I was pointing out, Judge Montgomery Reeves, the history and the common law and whether this is a relatively recent vintage. And then you apply it to medical aid in dying, and you have a clear answer. And the reason it's clear here is because Glucksburg did that history analysis for us. And so this is actually the easiest case you can imagine where you have McBurney, you plug in Glucksburg, and you're done. There's a difference between a fundamental privilege under the Privileges and Immunities Clause and a fundamental right? Are those two different things? I do think they're two different things. Does something have to be a fundamental right to be a fundamental privilege? No. One of the things that McBurney looks at was, is this a constitutional right? And they said no, obviously, for that case. And obviously, Glucksburg answers that question for us here. There's some daylight, I think. It's tough to imagine. But, you know, sometimes the right to vote, we would say, is a right, but you don't have to provide that to out-of-state residents and things like that. So access to courts, you don't have to do on exactly the same terms and things like that. So just, I think, by and large, something being a constitutional right under the McBurney analysis will go a pretty far way, especially now that we have cases deciding constitutional rights using a McBurney-style analysis of history. Let me ask you about Bolton. So the court says, all right, the appellants attack the Georgia law on several grounds. And then it has divided out sections addressing each one of those grounds. One of those sections deals with the Privileges and Immunities Clause. And that's what we're talking about. And it says, just as the Privileges and Immunities Clause protects persons who enter other states to ply their trade, so must it protect persons who enter Georgia seeking the medical services that are available there. Why is that not a holdup? Well, they're referring specifically to the medical service at issue in that case, which is abortion, which they had just recognized as a constitutional right. And I think you have to harmonize it with the other Supreme Court cases that I'm talking about, the ones that say to frame it narrowly, the ones to say not reading an opinion like a statute, and especially McBurney, which tells you the analysis to do. And again, if you do the McBurney analysis, this is not unlike other areas of the law where there's a Supreme Court case, there's some sort of broad language, courts have to deal with it. Courts stopped applying the Lemon Test in the First Amendment context before it was formally overruled. There's some broad language about law-abiding citizens and things in Heller, but the court decided Bruin and there's a new framework, and we look at it under that framework. And I would say the same thing is going on here. There's some broad language involved. But we didn't do Bruin. The Supreme Court did that, right? No, that's right. But the Supreme Court also did McBurney. And the McBurney analysis is what's driving this. I think Glucksburg is what makes it an easy case because you plug in the historical analysis from Glucksburg, which covers everything that McBurney is asking you to cover. So let me just take a step back. So what you would say in response to my question is you can't just read that language. Language is a holding, but you can't just read that. You have to take it in context. And because the right at issue in this particular case was abortion, then that language must be limited to abortion. I think so. I think that's a fair characterization of what I'm saying, which is you look at the circumstances of the case and how they were applying it. And if you had a privileges and immunities case about abortion, I think you would have to more directly grapple with Bolton. We obviously don't have that here. And in fact, we have an easier case here because Glucksburg can plug right into McBurney. And so even if you accept that it's a holding, I don't view it that way. I think it's fairly broad dicta for the reasons we've talked about. But even if you viewed it as a holding, I think you do what the Supreme Court tells us in all of its other cases, which is don't read it literally. Frame the right narrowly in privileges and immunities cases and apply McBurney. And when you do that, I think it's a fairly easy case. On the merits, I want to talk about the state's justifications for the law. Sure. You have three that are increasing levels of generality that all go to kind of avoiding friction with other states. I was a little surprised there was no discussion about residency plugging into the verifying,  someone in fact has six months left to live. It's not doing this out of depression or anxiety, but it's genuinely that the person meets these criteria, et cetera. And, you know, other aid in dying laws, et cetera, go to the issues of someone's mental state. Is that an interest that's connected to this law here about the ability to track residents rather than deaf tourists? I think there's some, there's something to that, your honor. I think this goes to the court's third focus question about the ongoing connection to in-state physicians. You see this in, in the piece of our statute, that's 26 colon 16 dash eight, which requires a physician to refer someone if they may not be capable of making an informed choice to refer them to a mental health professional who's also licensed under New Jersey law. And they can't sign off on an end of life medication until the mental health professional signs off. So I think that's certainly a valid reason, obviously under rational basis review, any conceivable reason goes, and we think that's a fair reading of the statute. We of course have the other justifications that we've been talking about, the liability for doctors out of state, which is obviously conceivable. It's obviously a reasonable concern. And frankly, it goes even further than that because we think our doctors would be chilled from doing this at all if we granted this to all residents and they were possibly subject to criminal liability in other states, and that would defeat the purpose of the law, of course. So we obviously have very good reasons for that. We don't think going to a couple of Judge Ambrose, your questions about whether we need discovery and Judge Pivas, you mentioned this as well, on the interest balancing. So there's two independent ways for us to have victory on the privileges and means in dormant commerce. You could go directly to interest balancing, you could do the threshold analysis, and I think we win there for the reasons that I'm saying here and the reasons in our briefs. But you don't need discovery for any of it. The interest balancing, I don't see how it would be any different than the rational basis review you're doing now. Adjudicated facts or legislative facts? Are these facts the court could take judicial notice of? Certainly, I think they can take... The statute has findings, so you're looking at the face of the law. I think my friend on the other side said in the context of the dormant commerce clause in response to your question, Judge Ambrose, he said you look at the face of the statute. And we agree. You look at the face of the statute and there's many cases deciding both these threshold questions of dormant commerce clause, whether there's economic protectionism, obviously we say no, and even pike balancing. And I would point to the Just Puppies case out of the Fourth Circuit and the New York Pet Welfare case out of the Second Circuit. So either one, I think you look at the face of the statute, you can look at the justifications. On rational basis, they have to have... I see my time's up, but if I could just finish the thought. We do the interesting balancing on the rational basis and we have very good reasons and good justifications and it would be the same for the other things as well. Thank you. Thank you, Your Honors. Your Honors, let me say one thing about my friend on the other side's arguments about the standing for each of our clients. Starting with Ms. Gavatos. So the option to take the medication is what is statutorily at issue here. It's not that she will definitely take it. It is that the legislature wanted people to be able to get the medication to have the option to take it. This is throughout the statute, one place I'll point to is an informed decision is a request to obtain a prescription for medication that the patient may choose to self-administer. There's no requirement that she has decided definitively that she wants to use The statute has a long wind-up that is full of safeguards to make sure that people are making informed decisions here. So I think for the three factors the court looks at for ripeness, the last one is the most critical here, which is would a judgment do anything for her? Or are there still facts? Is it a possibility that none of this might come to pass? If the district court had entered judgment for us, the next day, Ms. Gavatos could have found a physician, told him that she was eligible for this care, arranged for the care. She could have had him do the initial determination of the diagnosis which is required. She could have asked for a prognosis which was required. And maybe that physician would have said at that point, yes, my view is you have six months to live. But the doctor would have told her at that time, let's say whenever this was 2013-2014, perhaps that I can't certify that you're within six months of death based on the objective findings that I have done in terms of the exam I did of you. Then what? So in that case, she wouldn't have been eligible for the medication at that time, but would have been able to initiate care. I mean, imagine the position that we are in, she's in, before we file this lawsuit, where she has a stage four cancer diagnosis, she's 79 years old, she wants to plan at that time for her end of life care. If she were to go to her doctor then, the doctor would not be able to tell her, yes or no, you have a six month prognosis because the attending physician is the one who has to make that determination. All he would say to her is, you're not a resident, so I'm not able to provide you this treatment at all. That door was closed to her and would be opened if the residency requirement was not there. But the door, in terms of ripeness, it is relevant that she's not at all sure. She just wishes to have an option. Your friend on the other side pointed out there are going to be some patients who say, yes, I want to do this when I have six months left to live. Your Honor, I disagree with that, and I disagree that that is the statutory scheme. The statutory scheme is not intended for people who definitively want to take medical aid in dying. It's for people who want to make, the ability to make the choice if their suffering becomes unbearable. That's throughout the statutory scheme. Everywhere it references this. It's about patients who may choose to self-administer the medication. The question here is, in terms of ripeness, whether she's harmed. And you have to define the harm as the loss of an option, but that's not as ripe as it would be for someone who knows, I'm going to do this. Your Honor, in this case, we're seeking declaratory and injunctive relief. She doesn't have to show that she's experienced a harm already. She has to show that it is reasonably likely that she will experience a harm. She has an incurable cancer diagnosis. It is not a question of if for her. It's a question of when. There's no facts that are still to be developed for her that this court would say, well, this may never come to pass at all. She might get hit by a car tomorrow, and then this won't come to pass. But the when is a certification that this person is within six months of death. But that's not the question for ripeness, Your Honor, because that certification happens far along in the process. A doctor might, you might go see someone, and you might say, I have this diagnosis. Can you tell me if you agree with the diagnosis? And then if you think the prognosis is six months to live, the doctor might say, yes, it is, or no, it's not. If the doctor says, no, it's not, this has come back in a few months, come back in six months. We'll monitor your treatment. But if she went to a doctor in August of 2023, when we filed the complaint, and said, I would like you to provide me this care. Can you determine if I'm eligible? The doctor would have said, well, I know you're not, because you're not a resident. And that would have been the end of it. A judgment in her favor would avoid, would remove that obstacle to care that she's seeking to get today. Which kind of brings us back full circle. Let's say in 2023, when she brought this particular complaint, that Delaware had the, the Medical Care and Dying Act in play. She wouldn't have gone to New Jersey, right? She would have stayed in Delaware. I don't know what she would have done, Your Honor, but I don't think it would bear on the constitutionality of New Jersey, forbidding her from coming to this state. I mean, there are 10 other states that allow it. And, you know, we don't have an Oregon or a Vermont plaintiff, because those people can get their treatment there. But if we had a Vermont plaintiff, I don't think you would say that the challenge to New Jersey is prohibiting them from doing it in this state, is not a judiciable controversy. So I thought I heard you say at the beginning that the case would be moot in 2026. Your position then is that, no, it will not. I said, Your Honor, that at worst it would be moot, but I actually do not think it would be moot. It's certainly not a problem today, but even if we get to- I'm saying it's not a problem today. Yeah. Fast forward to January 10, 2026. I don't think it's moot. I don't think it's moot. New Jersey is still not constitutionally allowed to discriminate against its non-residents in the services that it allows to be provided in its state, even if other states have also allowed to provide those services. This may not be correct what I'm going to say, but it almost sounds like you're asking us in that context for an advisory opinion. I don't think so at all, Your Honor. We want a judgment that the statute is unconstitutional, which Ms. Skivatos will use to take action tomorrow that she's not able to do today. The one last thing I'll say just prophylactically on standing here is, if Your Honors are not convinced we have standing, which I really think you should be, but if you aren't, then the right move would be to vacate the dismissal of prejudice of the district court, not to affirm the dismissal of prejudice because it would lack jurisdiction to enter it. And then we could file another case when we have- And if you vacate, could you go back and ask the district court to develop some reasons, or New Jersey, I should say, to develop reasons for why and enact this legislation and have that considered by Judge Baum? I think that if we were- Well, if her decision were vacated for jurisdictional grounds, we would need to file a new case. But if we were in discovery, I think that's something that New Jersey would- No, it would be vacated under 1286 for purposes of getting more information, more data in play for purposes of deciding the case. So, Your Honor, that's how we think the case ought to be decided. The court should vacate her decision, dismissing the complaint, and send it back for discovery, and we'll be back here on summary judgment. If the court decides that we didn't have standing to start with, then the court should still vacate her decision as a dismissal with prejudice because she didn't have jurisdiction to enter it in the first place. Then we would file a new complaint curing whatever deficiencies that were raised at this point in our standing, if there are any. We were a little handcuffed here because Your Honor has pointed us- Disagreed with my characterization of the allegations in paragraph 41. I think on a facial challenge to standing on our complaint, we're entitled to inferences in our favor of those allegations. If it were a factual challenge, we would have been able to put in a declaration from Dr. Bryman saying, here's all these people who have contacted me, but I haven't been able to treat. We didn't do that because we weren't challenged on that up until this court. Okay. We thank both parties for excellent briefing and oral argument. We'll take-